# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

GARY LEE BOULDIN,          )
                                       )

      **Plaintiff,**            )
                                       )      **Civil Action No. 3:11-1019**

**v.**                               )      **Judge Nixon / Knowles**
                                       )

**CAROLYN W. COLVIN,**         )
**Acting Commissioner of Social Security,[1]**  )
                                       )

      **Defendant.**           )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket No. 9. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 15.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin should be substituted for Commissioner Michael J. Astrue as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

1

Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff filed his application for Disability Insurance Benefits ("DIB") on March 24, 2009, alleging that he had been disabled since December 1, 2004, due to diabetes, hypertension, kidney problems, Bell's Palsy, vision problems, and anxiety.[2] *See, e.g.,* Docket No. 7, Attachment ("TR"), pp. 17, 72, 83, 127-28, 179. Plaintiff later additionally claimed Asperger Syndrome and Borderline Intellectual Functioning as disabling impairments. TR 21, 492, 501. Plaintiff's application was denied both initially (TR 59, 72) and upon reconsideration (TR 60, 83). Plaintiff subsequently requested (TR 76-77) and received (TR 87-92) a hearing. Plaintiff's hearing was conducted on June 14, 2010, by Administrative Law Judge ("ALJ") K. Dickson Grissom. TR 17, 33-54. Plaintiff appeared and testified. *Id.* Vocational Expert ("VE") Edward M. Smith appeared at the hearing, but did not testify. *Id.*

On July 8, 2010, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 17-27. Specifically, the ALJ made the following findings of fact:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2006.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of December 1, 2004 through his date last insured of December 31, 2006 (20 CFR 404.1571 *et seq.*).

---

[2] Plaintiff also filed a claim for Supplemental Security Income, but this claim was denied on April 6, 2009. TR 17, 63-68, 123-26. Plaintiff did not appeal. TR 17.

3. Through the date last insured, the claimant had the following medically determinable impairments: Hypertension; Prostate Cancer successfully treated with implanted radiation seeds (20 CFR 404.1521 *et seq.*).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments (20 CFR 404.1521 *et seq.*).

5. The claimant was not under a disability, as defined in the Social Security Act, at any time from December 1, 2004, the alleged onset date, through December 31, 2006, the date last insured (20 CFR 404.1520(c)).

TR 19-27.

Plaintiff timely filed a request for review of the hearing decision. TR 12-13. On August 26, 2011, the Appeals Council issued a letter declining to review the case (TR 1-5), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## III. CONCLUSIONS OF LAW

3

## A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence:

4

(1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of

5

the "listed" impairments[3] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.

(4)     If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)     Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*,

---

[3] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

6

820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ failed to: (1) properly evaluate the severity and onset of Plaintiff's physical and mental impairments; (2) properly assess Plaintiff's residual functional capacity ("RFC"); (3) obtain testimony from the VE; and (4) properly evaluate Plaintiff's credibility. Docket No. 10. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record

7

adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171,

176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. Evaluation of Plaintiff's Physical and Mental Impairments

Plaintiff argues that the ALJ erred in his analysis at step two of the five-step evaluation

process. Docket No. 10. Specifically, Plaintiff argues that the ALJ: improperly discounted the

opinions of Dr. Gale; failed to obtain a consultative mental evaluation or call a medical advisor

to the hearing; "mistakenly reasoned that Plaintiff did not have a severe impairment because his

mental impairment did not meet or equal a listed impairment"; improperly found that Plaintiff's

mental impairments did not exist before his date last insured ("DLI"), because Dr. Gale

diagnosed Plaintiff with Aspergers Syndrome and anxiety disorder, and Aspergers Syndrome is a

developmental disorder that manifests during childhood (*e.g.*, people do not "get" Aspergers

Syndrome as an adult); improperly discounted the statements of Plaintiff and his family;

improperly applied SSR 83-20 when considering a retroactive onset in disabilities of non-

traumatic origin; and improperly ended his evaluation at step two. *Id*.

Noting that "the evidence during the relative period is scanty," Defendant responds that

the ALJ properly considered that evidence, "relied on substantial evidence in the record, applied

the appropriate standards, and gave an extensive statement of his reasons for the determination."

Docket No. 15, *referencing* TR 20-27. Regarding the ALJ's evaluation of Dr. Gale's opinions,

Defendant argues that the ALJ appropriately considered and discounted Dr. Gale's June 2009

mental assessment of Plaintiff and his subsequent 2010 report. *Id*. Defendant contends that the

ALJ properly observed that: the 2009 assessment was rendered based on a one-time examination;

Dr. Gale was the first physician to diagnose the (then) fifty-four year old Plaintiff with any

8

mental impairments; Dr. Gale, in 2010, revised his 2009 opinion and retroactively expanded on the restrictions and limitations of his 2009 opinion, despite the fact that Plaintiff had not received any mental health treatment between 2009-2010 and there were no new examination findings; Dr. Gale's single examination report had internal inconsistencies; and Dr. Gale's opinion was inconsistent with, and unsupported by, Plaintiff's school records, which were the only contemporaneous evidence in the record from that era. *Id*. Defendant asserts that the ALJ properly evaluated the evidence of record when considering Dr. Gale's opinions and diagnoses, and argues that the ALJ did not have to simply accept Dr. Gale's 2010 opinion that Plaintiff's previously undiagnosed Aspergers Syndrome had disabled Plaintiff since 1970. *Id*. Defendant notes that Aspergers Syndrome is not per se disabling under the Act, and also notes that an ALJ can properly determine that a claimant's Aspergers Syndrome is not a severe impairment. *Id*.

Regarding the ALJ's consideration of Plaintiff's alleged onset date, Defendant argues that December 1, 2004 was the disability onset date listed in: Plaintiff's applications; the disability report provided on or after April 2, 2009; the agency documentation from May, June, and July 2009; the requested onset date in an October 2009 letter from Plaintiff's counsel to the ALJ; and the May 2010 notice of hearing. *Id*. Defendant also argues that, at the June 2010 hearing, Plaintiff's counsel did not object to the ALJ's consideration of the issue of disability from December 1, 2004. *Id.* Defendant further notes that, to Plaintiff's benefit, the ALJ, upon reviewing the evidence of record, determined that an onset date of 2001 might be implied from Plaintiff's work history. *Id*. Defendant additionally contends that Plaintiff's argument that the ALJ erred in determining his disability date is illogical, because the ALJ did not find Plaintiff disabled, and because absent a finding of disability, it is not possible to determine when

9

disability began. *Id*.

   With regard to Plaintiff's contention that the ALJ should have ordered a consultative examination or called a medical advisor to the hearing, Defendant responds that Plaintiff bears the burden of proof at steps one through four of the sequential evaluation; that the ALJ does not need to order further evaluation or evidence unless the record in the case is inadequate for the ALJ to render a decision; and that the ALJ does not need to complete a special technique when no medically determinable mental impairment has been proven during the relevant time period. *Id*. With respect to Plaintiff's contention that he has proven that his physical impairments were disabling before his DLI, Defendant maintains that the records cited by Plaintiff concerning his health and limitations after the relevant period are not pertinent to a determination about the limitations established by the record during the relevant period, and that the records from the relevant period support the ALJ's decision. *Id*. Defendant notes that the ALJ concurred with the opinions of every physician of record who rendered an opinion regard Plaintiff during the relevant period. *Id*. Defendant contends that the "sole medical opinion to which the ALJ gave no weight to was that of examining physician Dr. Gale, whose 40-year retroactive opinion of severely disabling mental impairments furnished more than three years after the relevant period was inadequately substantiated and did not comport with other relevant evidence." *Id*. Defendant further contends that the ALJ properly considered the opinions of Plaintiff's family members, appropriately noted inconsistencies between the opinions themselves and with the evidence of record, properly reasoned that the lay opinions were neither medical nor impartial objective evidence, and ultimately concluded that the familial statements did not provide a suitable basis on which to support a finding of disability. *Id*. Defendant asserts that, contrary to Plaintiff's

10

assertions, the ALJ did not purport to identify the motivation of the family members' statements, but rather, suitably observed a family effort to facilitate a disability award without furnishing the necessary proof of disability. *Id*.

Finally, Defendant states that Plaintiff's argument that "the ALJ mistakenly denied the case at step two because of the alternative step three analysis finding that Plaintiff clearly had not proved he had a listed impairment during the relevant period," "makes no sense" because the ALJ denied the case at step two and that ended the sequential evaluation. *Id*. Defendant contends that the ALJ's observance that the record in no way would support a finding of disability at step three does not change the sufficiency of the step two determination. *Id*. Defendant reiterates that Plaintiff bears the burden at steps one through four, argues that Plaintiff has failed to carry his burden, and maintains that the ALJ reached a reasoned decision that was supported by the evidence of record. *Id*.

As an initial matter, the sole issue before the ALJ in this case was whether Plaintiff had a severe impairment that significantly limited his ability to perform basic work-related activities for twelve consecutive months between December 1, 2004 and December 31, 2006, the relevant period in this action.[4] TR 19.

In the instant action, the ALJ evaluated the records from the relevant time period

---

[4] Basic work activities are the abilities and aptitudes necessary to perform most jobs, and include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. TR 20, *citing* SSR 85-28.

11

regarding Plaintiff's mental and physical impairments as follows:[5]

> The objective medical evidence of record documents the claimant was diagnosed with hypertension in 1993; his hypertension was treated with medication; prostate cancer in June 2004; and had a radiation seed implant to treat the prostate cancer in December 2004. (Exhibit 1F; 2F). Fortunately, the radiation seed implant was effective, and the claimant's prostate cancer has not re-occurred. (Exhibit 18F). The claimant had no other medical problems during the applicable time period. (Exhibit 2F).

> With respect to his prostate cancer, the claimant was found to have a elevated PSA of 5.4 by his primary care physician who referred him to Dr. Carl Rosen. (Exhibit 1F). An ultrasound-guided biopsy was performed on May 7, 2004. A very small Gleason 3+3=6 adenocarcinoma was found on the right side. The claimant was subsequently treated by Dr. Thomas Nesbitt who ordered a bone scan, CT scan of the abdomen and pelvis, both of which failed to reveal any evidence of metastatic disease. (Exhibit 2F). Dr. Nesbitt referred the claimant to oncologist Dr. James Gray for treatment. On August 2, 2004, the claimant and his brother met with Dr. Gray to discuss treatment options. Dr. Gray noted the claimant was very well spoken and conversant with him, but seemed to have some hesitancy in making his own decisions, relying on his brother to advise him. After a long discussion regarding the pros and cons of treatment options, including radical prostatectomy, external radiation therapy, radioactive seed implant, combination external and radioactive seed implant, and alternatives such as cryosurgery, heat ablation, and hormone therapy, the claimant was leaning towards seed implant treatment. He stated he would like to consider it with his brother; this was the ultimate treatment option that he chose. (Exhibit 2F). The claimant had the radiation seed implanted in December 2004; at follow-up on January 10, 2005 he was doing well; he was doing well and required no medications at his follow-up appointment [in] August 2005; and continued to do well throughout the remainder of 2005 and 2006. (Exhibit 2F).

---

[5] The ALJ noted that, although Plaintiff submitted records from outside the relevant time period, those records were not considered because they do not bear on the sole issue in this action: whether Plaintiff had a severe impairment that significantly limited his ability to perform basic work-related activities for twelve consecutive months between December 1, 2004 and December 31, 2006 (the relevant time period in this action). TR 26.

12

Fortunately, the radiation seed implant was effective, and the claimant's prostate cancer has not re-occurred. (Exhibit 18F). The claimant had no other medical problems during the applicable time period. (Exhibit 2F). The undersigned has assigned great weight to the opinions of Dr. Gray and Dr. Nesbitt.

The claimant's attorney however alleges the claimant had *mental impairments* that met Listings 12.05 and/or 12.10. The claimant's brother hired Dr. Scott Gale, Ed.D. to assess the claimant's mental status; Dr. Gale met the claimant on *one* occasion in 2009. Dr. Gale diagnosed Asperger's [*sic*] Syndrome, Anxiety Disorder, not otherwise specified, and Borderline Intellectual Functioning. (Exhibit 9F; 10F; 16F). These diagnoses were made in June of 2009. Dr. Gale later attempted to diagnose these conditions retroactively so that the claimant's condition would be found to have occurred before the claimant was 22 years of age and before the expiration of the claimant's date last insured. Therefore, he opined these conditions have existed for forty years i.e. since 1970. (Id.).

In determining an onset date in cases of non-traumatic origin, Social Security Rule 83-20 states the policy and describes the relevant evidence to be considered when establishing the onset date of disability. It provides in pertinent part:

> In disabilities of nontraumatic origin, the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity. The weight to be given any of the relevant evidence depends on the individual case.
>
> 1.  Applicant Allegations. The starting point in determining the date of onset of disability is the individual's statement as to when disability began.
>
> 2.  Work History. The day the impairment caused the individual to stop work is frequently of great significance in selecting the proper onset date.
>
> 3.  Medical and Other Evidence. Medical reports containing descriptions of examinations or treatment of the individual are basic to the

13

determination of the onset of disability. The medical evidence serves as the primary element in the onset determination. Reports from all medical sources (e.g., physicians, hospitals, and government agencies) which bear upon the onset date should be obtained to assist in determining when the impairment(s) became disabling. Determining the proper onset date is particularly difficult, when for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

In this case, the claimant, on forms completed by the claimant for the Administration, *alleged he became unable to work on December 1, 2004.* (Exhibit 1D; 2D). His *work history* shows the claimant was gainfully employed between 1981 and 1989 and again between 1997 and 2001 earning wages sufficient to establish quarters of coverage under Title III of the Act. (Exhibit 5D). After this time, he worked part time at his church as a custodian performing work that did not rise to the level of substantial gainful employment. The claimant's work history therefore implies an onset date after 2001.

With respect to medical and other evidence, the only medical and/or other evidence available during the period of the claimant's childhood is from his school records. The claimant's school records from Grundy County High School establish that in February 1969 the claimant took the Lorge Thorndike Intelligence Test and obtained an IQ score of 75. (Exhibit 1E at p. 4). He was in regular classes and graduated 78th out of a class of 121 in May 1973. (Id.; 6E). His grades in high school reflected he earned As and Bs and an occasional C. (Id. at p. 3). After high school, he was admitted to David Lipscomb University, which he attended for three years before he was suspended for poor academic performance. (Exhibit 1E). There may be many reasons that explain his poor academic performance in college, but none of them have been proven by evidence in the record.

The other medical and other evidence of record is from Dr. Scott

Gale, evidence from the claimant, statements from *some* of the claimant's family members, and evidence of his mental functioning from his attorney and physicians. Dr. Gale opined the claimant's limitations referred to in his report were present from 1970 through the date of his assessment. (Exhibit 16F). As support for his opinion, Dr. Gale states that the claimant was considered "odd" in high school; that his parents recognized this and tried to accommodate his needs in that they would not let him drive, and when he returned from college the claimant worked "under the protection" of his supervisor father, but was let go when his father could no longer protect him. (Id.).

There are several problems with the basis for Dr. Gale's opinions. First, according to the claimant's brother, *his parents never believed their son was mentally impaired*. In a letter to Senator Lamar Alexander, the claimant's brother stated that his mother and father never believed that the claimant "did not fully function as an adult." (Exhibit 3D). This is an implicit admission that the claimant functioned well as a child as it contains no mention of an alleged mental disability before age 22 i.e. when the claimant was a minor. (Exhibit 3D). Second, the persons closest to the claimant, his mother and father, whom he resided with his entire life except for when he went away to college, did not believe the claimant was impaired. (Id.). Third, since his parents were dead when Dr. Gale completed his assessment and Medical Source statement, any statements as to their purposes or motivation in their treatment of the claimant, is pure speculation. Fourth, the claimant does drive, so Dr. Gale's report is not factually accurate.

Another reason why the undersigned has not given weight to Dr. Gale's opinions is that they are not credible or consistent with the other evidence of record. First, it should be noted that Dr. Gale is a "hired gun" who was paid by the claimant's brother, Michael, to render his opinions based on one meeting with the claimant on June 9, 2009. (Exhibit 10F). The undersigned further notes that after Dr. Gale's opinions were reviewed, and found insufficient to meet Listing 12.05, Dr. Gale was prevailed upon to opine, on May 11, 2010, that the claimant's conditions existed over 40 years ago, in 1970. (Exhibit 16F). This blatant attempt to subvert the decision-making process impairs Dr. Gale's credibility. Furthermore, as noted _infra_, Dr. Gale's report is internally inconsistent.

In accordance with Social Security Ruling 06-03p, the undersigned has considered lay witness opinion testimony. The undersigned has considered the written statement of John Bouldin, the claimant's uncle, Ruth Bouldin, the claimant's aunt, James Bouldin, the claimant's uncle, Michael Bouldin, the claimant's brother, and Sara Grooms, the claimant's aunt, in accordance with SSR 06-03p, including the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence. (Exhibit 9E; 10E; 11E; 19E; 20E). *What is particularly striking however is that the claimant's brother, with whom he lives, has not submitted any statement claiming the claimant is mentally ill or retarded.* Dr. Gale also noted that **the claimant had never been evaluated in the past**. (Exhibit 10F at p. 10). This obviously suggests that at the time in question, no one thought the claimant was impaired with a mental disability. This is because his parents, like his brother Michael, never considered him fully disabled prior to this proceeding.

While none of the written statements that were submitted establish the claimant was mentally retarded or had Asperger's syndrome, a couple of the statements bear mention. In particular, the testimony of John Bouldin does not establish that the claimant is disabled. The fact that the claimant had a head injury at age five or six that doctors said caused no permanent damage, and for which the claimant evidently was never treated again, does not establish a mental impairment. As to the claimant's work at the church, it is a fact that most employees need supervision. (Exhibit 10E; 19E). Similarly, the fact that the claimant collected Star Trek memorabilia into his 40s, while perhaps not the norm in rural Tennessee, is a hobby that literally tens of thousands, if not hundreds of thousands of people routinely engage in, as evidenced by the well-attended Star Trek conventions and brisk sales of Star Trek memorabilia on Ebay. Some people even dress up as their favorite characters on Star Trek when attending the conventions. This does not establish they are mentally ill or retarded.

All these statements simply boil down to the claimant not having a high IQ as his relatives, having a different personality and values than his "successful" relatives in rural Tennessee, and their being unable to accept the differences between them. For example, James Bouldin stated he "grew up in a family that was always focused on work and goals." (Exhibit 10E). His entire statement describes how

the claimant does not focus on work and goals, as if that proves mental illness or retardation.

Since none of the claimant's relatives are medically trained to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms, the accuracy of the testimony is questionable. Moreover, by virtue of the relationship as a relative of the claimant, the witnesses cannot be considered disinterested third parties. In particular, the claimant's brother Michael seems heavily invested in obtaining disability benefits for the claimant as he is apparently worried that he will have to support the claimant. Most importantly, significant weight cannot be given to the witnesses' testimony because it simply is not consistent with the preponderance of the evidence in this case.

While the undersigned cannot definitely ascertain the claimant's family's subjective motivation for obtaining benefits, overall, the record clearly demonstrates a need for additional income while the record as a whole simultaneously fails to demonstrate a legitimate need based upon disability. As Dr. Gale candidly noted: [h]is family is concerned about how [the claimant] will support himself now that his parents are deceased and are currently looking for treatment options as well as exploring options such as Social Security Disability." (Exhibit 10F at p. 10). Notably it was the claimant's brother, Michael, not the claimant himself, who supplied Dr. Gale with all the external data upon which Dr. Gale relied. (Exhibit 10F at p. 2). Similarly, it was Michael Bouldin who contacted Senator Lamar Alexander requesting assistance with the instant claim. (Exhibit 3D). Put more simply, when the claimant's parents supported him, no one claimed he was disabled, mentally retarded, or autistic. However, now that his parents are deceased, the claimant's family has hired a lawyer, and an "expert" to render an opinion supporting them. (Exhibit 3D).

Finally, Dr. Gale's opinions and the family statements referenced above, are contradicted by the claimant himself. He attended regular classes throughout his school years; graduated a little below the middle of his class; and attended college for three years. He has demonstrated he is literate and he accurately set forth his work history, duties, salaries, hours of work, and the physical exertion required for each job in his own handwriting on forms for

the processing of his claim. (Exhibit 5E; see also 6E). His own attorney believes he is competent to sign legal documents. For example, his attorney had the claimant sign the fee agreement in this case. (Exhibit 2B). The evidence also documents the claimant has his own checking account and "Time Deposit account". (Exhibit 3B). Further, the claimant obviously has the mental ability to make complicated decisions about his medical care. (Exhibit 2F). He also signed all the medical forms consenting to surgical procedures. (Exhibit 6F). No doctor required a power of attorney or guardian to make medical decisions for the claimant.

Dr. Gale's report also establishes the claimant has good adaptive functioning. For example, when his mother died, he learned to grocery shop and cook. He even clips and uses coupons to save money at the grocery store. Dr. Gale also opined he was able to handle his own funds if awarded benefit. The claimant also successfully adapted to changes in his medical condition when he was diagnosed with cancer. The record reflects he made complicated decisions regarding his treatments as discussed above.

***In the alternative***, it is clear that the claimant does not meet listing 12.05 or listing 12.10. In order for the claimant to prove an impairment that meets listing 12.05, the regulations explain that significantly sub-average intellectual functioning must be initially manifested during the developmental period i.e. the evidence demonstrates or supports onset of the impairment before age 22. Only if this threshold requirement is met are the required levels of severity set forth in paragraphs A, B, C, and D analyzed. In this case, the claimant cannot meet listing 12.05 because the evidence does not demonstrate or support a finding of onset before the age of 22. In fact, the objective evidence demonstrates exactly the opposite. The claimant's school records from Grundy County High School establish that in February 1969 the claimant took the Lorge Thorndike Intelligence Test and obtained an IQ score of 75. (Exhibit 1E at p. 4). He was in regular classes and graduated 78th out of a class of 121 in May 1973. (Id.; 6E). His grades in high school reflected he earned As and Bs and an occasional C. (Id. at p. 3). Accordingly, he was admitted to David Lipscomb University, which he attended for three years before he was suspended for poor academic performance. (Exhibit 1E). There may be many factors that explain his poor academic performance in college, but none of them have been proven by evidence in the record. The claimant was also gainfully employed between 1981

18

and 1989 and again between 1997 and 2001 earning wages sufficient to establish quarters of coverage under Title III of the Act. (Exhibit 5D).

Although the claimant's attorney points to the IQ testing performed by Dr. Gale, this testing was done in 2009 and therefore is not relevant. In short, there is nothing in the record to document an IQ of 70 or below before the claimant reached the age of 22. In fact, the evidence of record establishes his IQ was 75. Therefore, the undersigned finds the claimant does not meet Listing 12.05.

*In the alternative*, the undersigned has also considered whether the claimant meets Listing 12.10. In order to establish a claim under 12.10 the claimant must be autistic or have other pervasive developmental disorders. Since autism has not been diagnosed, the undersigned will consider whether the claimant had a pervasive developmental disorder during the applicable time period that met both of the following requirements:

> a.    Qualitative deficits in reciprocal social interaction; and
>
> b.    Qualitative deficits in verbal and non-verbal communication and in imaginative activity;
>
> AND
>
> Resulting in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration.

20 CFR 404, Subpart P, Appendix 1 at 12.10. No evidence has been presented to establish qualitative deficits in reciprocal social interaction, and qualitative deficits in verbal and non-verbal communication and imaginative activity. In fact, Dr. Gale's report noted the claimant did not appear to be under undue distress during the interview and he made appropriate eye contact. He noted he was somewhat excessively talkative; speech quality was normal; and no speech impairment was evidenced. (Exhibit 10F at p. 9).

19

Nor does the claimant have two marked restrictions or repeated episodes of decompensation. Dr. Gale's Mental Assessment of the claimant opined the claimant had marked restrictions in maintaining concentration, persistence and pace; his written report however, states *objective testing* revealed the claimant's ability to sustain attention, concentrate, and exert mental control was in the borderline range. (Exhibit 9F; 10F at p. 5).) [*sic*] This was in direct contradiction to his report that found "[a]ttention and concentration appeared mildly impaired and he was easily distracted" and that "memory functions appeared grossly intact".[6] The claimant has had no episodes of decompensation, each of extended duration and there is no assessment that he has marked difficulties maintaining social functioning. Indeed, the evidence is exactly the opposite with the claimant interacting appropriately with his physicians, Dr. Gale, and others. He also sends greeting cards on appropriate occasions to friends and relatives.

With respect to the claimant's activities of daily living, Dr. Gale reported the claimant takes care of his own personal need including taking his medications without assistance or prompting; the claimant reported he could take care of himself; he prepares simple meals for himself; grocery shops and uses coupons to save money; does the laundry for himself and his brother Allan with whom he lives; drives to McMinnville every weekend to see a movie; contributes small amounts to two charities; goes to the post office; interacts socially with people at the grocery store and post office; sends out greeting cards on appropriate occasions; enjoys reading, watching television and movies; and walks 30 minutes a day for exercise. (Exhibit 10F at p. 4). The undersigned finds the claimant does not have any marked restrictions in activities of daily living.

In sum, the claimant's physical and mental impairments, considered singly and in combination, do not significantly limit the claimant's ability to perform basic work activities. Thus, the claimant does not have a severe impairment or combination of impairments.

TR 20-26 (emphasis original)(footnote original).

---

[6] These internal contradictions in Dr. Gale's reports also negatively affect his credibility.

20

As noted above, Plaintiff argues in this statement of error that the ALJ erroneously evaluated Plaintiff's physical and mental impairments by: improperly discounting Dr. Gale's opinions; failing to obtain a consultative mental evaluation or call a medical advisor to the hearing; "mistakenly" reasoning that Plaintiff did not have a severe impairment because his mental impairment did not meet or equal a listed impairment; improperly finding that Plaintiff's mental impairments did not exist before his DLI because Dr. Gale diagnosed Plaintiff with Aspergers Syndrome and anxiety disorder, and Aspergers Syndrome is a developmental disorder that manifests during childhood (*e.g.*, people do not "get" Aspergers Syndrome as an adult); improperly discounting the statements of Plaintiff and his family; improperly applying SSR 83-20 when considering a retroactive onset in disabilities of non-traumatic origin; and improperly ending his evaluation at step two. Docket No. 10.

With regard to Plaintiff's contentions about the opinions rendered by Dr. Gale, as can be seen in the quoted passages above, the ALJ in the case at bar properly evaluated Dr. Gale's opinions and articulated his reasons for discounting them. Although Plaintiff argues that, because the ALJ referred to Dr. Gale as a "hired gun," he improperly "reject[ed] the favorable decision of a consulting physician solely because the consultative examination was arranged for by the claimant's representative," the ALJ did no such thing. The ALJ's extremely detailed explanation of his rationale clearly demonstrates that he did not reject Dr. Gale's opinions "solely" because Dr. Gale examined Plaintiff at the request of Plaintiff's brother and attorney. Noting that Dr. Gale had seen Plaintiff on only one occasion, in 2009, at the request of Plaintiff's brother, and that Dr. Gale had subsequently tried to retroactively change his opinions despite there being no new treatment or evaluation, the ALJ explained that he did not accept Dr. Gale's opinions because

they were contradicted, *inter alia*, by: (1) his own notes, reports, and findings, (2) Plaintiff's school records (being in regular classes, getting mostly As and Bs with the occasional C, graduating high school just below the midline of his class, being accepted into university, and completing three years of university); (3) Plaintiff's high school IQ score of 75; (4) the fact that Plaintiff's physicians and attorney allowed Plaintiff to make decisions on his own behalf and sign medical and legal documents without a guardian; (5) Plaintiff's ability to adapt after he was diagnosed with cancer and after his mother died; (6) the fact that neither his parents nor his brother Allan (the family members with whom has Plaintiff lived) thought that Plaintiff was disabled or sought assistance for him; (7) Plaintiff's ability to care for himself; (8) Plaintiff's appropriate social interactions; (9) Plaintiff's ability to accurately recount his medical and work history; and (10) Plaintiff's activities of daily living. Contrary to Plaintiff's assertions, the reasons given by the ALJ were not "speculative"; rather, the ALJ's rationale was based on, and supported by, the evidence of record. Plaintiff's argument that the ALJ improperly discounted the opinions of Dr. Gale fails.

Because the ALJ properly evaluated and discounted Dr. Gale's opinions, the ALJ was not bound to accept Dr. Gale's diagnoses, including Aspergers Syndrome. Moreover, a diagnosis of Aspergers Syndrome is not per se disabling. *Gerst v. Secretary*, 709 F.2d 1075 (6th Cir. 1983). As explained in the ALJ's rationale, Plaintiff graduated from high school, attended three years of university, worked, made medical and legal decisions, adapted when he was diagnosed with cancer and when his mother died, cared for himself, etc. Accordingly, the ALJ could properly discern that Plaintiff did not have a severe mental impairment that existed before his DLI; Plaintiff's argument fails.

22

Regarding Plaintiff's contention that the ALJ improperly discounted the lay witness opinion evidence, the ALJ's rationale demonstrates that the ALJ carefully considered all of the familial evidence. After explicitly acknowledging the opinions considered, the ALJ explained in detail his reasons for discounting them:

> In accordance with Social Security Ruling 06-03p, the undersigned has considered lay witness opinion testimony. The undersigned has considered the written statement of John Bouldin, the claimant's uncle, Ruth Bouldin, the claimant's aunt, James Bouldin, the claimant's uncle, Michael Bouldin, the claimant's brother, and Sara Grooms, the claimant's aunt, in accordance with SSR 06-03p, including the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence. (Exhibit 9E; 10E; 11E; 19E; 20E). *What is particularly striking however is that the claimant's brother, with whom he lives, has not submitted any statement claiming the claimant is mentally ill or retarded.* Dr. Gale also noted that **the claimant had never been evaluated in the past**. (Exhibit 10F at p. 10). This obviously suggests that at the time in question, no one thought the claimant was impaired with a mental disability. This is because his parents, like his brother Michael, never considered him fully disabled prior to this proceeding.
>
> While none of the written statements that were submitted establish the claimant was mentally retarded or had Asperger's syndrome, a couple of the statements bear mention. In particular, the testimony of John Bouldin does not establish that the claimant is disabled. The fact that the claimant had a head injury at age five or six that doctors said caused no permanent damage, and for which the claimant evidently was never treated again, does not establish a mental impairment. As to the claimant's work at the church, it is a fact that most employees need supervision. (Exhibit 10E; 19E). Similarly, the fact that the claimant collected Star Trek memorabilia into his 40s, while perhaps not the norm in rural Tennessee, is a hobby that literally tens of thousands, if not hundreds of thousands of people routinely engage in, as evidenced by the well-attended Star Trek conventions and brisk sales of Star Trek memorabilia on Ebay. Some people even dress up as their favorite characters on Star Trek when attending the conventions.

23

This does not establish they are mentally ill or retarded.

All these statements simply boil down to the claimant not having a high IQ as his relatives, having a different personality and values than his "successful" relatives in rural Tennessee, and their being unable to accept the differences between them. For example, James Bouldin stated he "grew up in a family that was always focused on work and goals." (Exhibit 10E). His entire statement describes how the claimant does not focus on work and goals, as if that proves mental illness or retardation.

Since none of the claimant's relatives are medically trained to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms, the accuracy of the testimony is questionable. Moreover, by virtue of the relationship as a relative of the claimant, the witnesses cannot be considered disinterested third parties. In particular, the claimant's brother Michael seems heavily invested in obtaining disability benefits for the claimant as he is apparently worried that he will have to support the claimant. Most importantly, significant weight cannot be given to the witnesses' testimony because it simply is not consistent with the preponderance of the evidence in this case.

TR 23-24.

As demonstrated, the ALJ considered the familial lay witness opinion testimony and explained that he could not accord it significant weight because it was not consistent with the preponderance of the evidence in this case. The ALJ discussed the inconsistencies and articulated his responses to specific allegations made by family members. The ALJ's analysis was proper; Plaintiff's argument fails.

With respect to Plaintiff's contention that the ALJ erroneously failed to obtain a consultative mental evaluation and/or call a medical advisor to the hearing, the Regulations require an ALJ to do so only when there is insufficient evidence in the record on which the ALJ

can base his decision. 20 CFR 404.1517. As can be seen by the ALJ's lengthy and detailed analysis of the evidence before him, the record in the case at bar contains sufficient evidence upon which the ALJ could base his decision. Thus, the ALJ was not bound to order a consultative evaluation and/or seek testimony from a medical advisor. Plaintiff's contention fails.

Regarding Plaintiff's assertion that the ALJ improperly applied SSR 83-20, Plaintiff argues that the opinions of Dr. Gale, Plaintiff, and Plaintiff's family members support the determination of a retroactive onset date. First, as analyzed above, the ALJ appropriately considered and discounted the opinions of Dr. Gale and Plaintiff's family. Accordingly, the ALJ did not have to accept those opinions as evidence of a 1970 retroactive onset date. Next, as has been demonstrated by the ALJ's quoted rationale and in the undersigned's analysis above, the ALJ properly evaluated Plaintiff's allegations, work history, and medical and other evidence concerning impairment severity (including the opinions at issue) and found that the evidence supported a retroactive onset date of 2001 (not 2004 as Plaintiff alleged, or 1970 as Dr. Gale and some members of Plaintiff's family alleged). The ALJ appropriately applied SSR 83-20, and made a reasoned determination that was based on substantial evidence. Plaintiff's argument fails.

Plaintiff's remaining sub-issues contained in this statement of error will be discussed together, as they are related. Plaintiff contends that the ALJ improperly ended his evaluation at step two; and "mistakenly" reasoned that Plaintiff did not have a severe impairment because his mental impairment did not meet or equal a listed impairment. As discussed above and in the ALJ's decision, step two of the sequential evaluation requires the ALJ to determine whether

25

Plaintiff has a medically determinable impairment that is "severe" or a combination of impairments that are "severe." TR 18, *citing* 20 CFR 404.1520(c). An impairment is "severe" within the meaning of the Regulations if it significantly limits an individual's ability to perform basic work activities for a minimum of twelve consecutive months. *Id., citing* 20 CFR 404.1521; SSR 85-28, 96-3, 96-4. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. *Id.* If the ALJ finds that Plaintiff does not have a severe medically determinable impairment or combination of impairments, then Plaintiff is not disabled, and the inquiry ends there. The analysis proceeds to step three only if the ALJ finds that Plaintiff has a severe impairment or combination of impairments. As noted above, Plaintiff bears the burden at steps one through four.

In the instant case, Plaintiff's DLI is December 31, 2006 (TR 19); therefore, Plaintiff must prove that he had a severe impairment or combination of impairments that significantly limited his ability to do basic work-related activities for twelve consecutive months before his DLI. *Id.* In addition to physical limitations, Plaintiff claims that he also had disabling mental impairments through his DLI. TR 21, 179, 492.

When determining whether Plaintiff had an impairment or combination of impairments that significantly impaired his ability to perform basic work-related activities for at least twelve consecutive months, the ALJ explained:

> Basic work activities are the abilities and aptitudes necessary to do most jobs. Examples of those include:

1.     Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

2.     Capacities for seeing, hearing, and speaking;

3.     Understanding, carrying out, and remembering simple instructions;

4.     Use of judgment;

5.     Responding appropriately to supervision, co-workers, and usual work situations; and

6.     Dealing with changes in a routine setting (SSR-85-28).

TR 20.

In ultimately determining that Plaintiff did not have an impairment or combination of impairments that significantly limited his ability to perform basic work activities for at least twelve consecutive months, the ALJ indicated that he had considered all of the relevant medical, testimonial, and other opinion evidence of record and determined the extent to which each could be reasonably accepted as consistent with, and supported by, substantial evidence in the record. *Id., citing* 20 CFR 404.1527, 404.1529; SSRs 96-2p, 96-4p, 96-5p, 96-6p, 96-7p, 06-3p. The ALJ explained the basis for this conclusion in his detailed discussion of the relevant evidence of record and his findings related thereto, recounted above. Because the ALJ properly considered all the evidence related to the relevant time period, reached a reasoned decision, articulated the basis for his decision, and had substantial evidence supporting his decision, the ALJ could appropriately find that Plaintiff did not suffer from an impairment or combination of impairments that was "severe." Absent such a finding, the ALJ must conclude that Plaintiff is not disabled, and appropriately end the sequential evaluation analysis at step two. Plaintiff's

27

contention regarding concluding the analysis at step two fails.

Plaintiff's argument that the ALJ "mistakenly" reasoned that Plaintiff did not have a severe impairment because his mental impairment did not meet or equal a listed impairment, is misplaced. As discussed above, the determination of whether a claimant has a severe impairment occurs at step two of the sequential evaluation, while the determination of whether a claimant's impairment meets or equals a listing occurs at step three, and there is no step three analysis without a finding of a severe impairment at step two. The ALJ in the case at bar did not find a severe impairment and properly ended the sequential analysis at step two. While the ALJ did cursorily address Plaintiff's listings contentions, he did so "in the alternative." The ALJ's alternative discussion does not affect the correctness of his step one and two determinations. As analyzed above, the ALJ properly determined that Plaintiff did not suffer from a severe impairment (either physical or mental). Contrary to Plaintiff's assertion, the ALJ did not determine that Plaintiff did not have a severe mental impairment because he did not meet a listing; rather, the ALJ determined that Plaintiff did not have a severe mental impairment because evidence including his school records, work history, activities of daily living, adaptability, etc., did not support such a finding. Plaintiff's argument fails.

For the reasons discussed above, Plaintiff's assertion that the ALJ did not properly evaluate the severity and onset of his physical and mental impairments fails.

## 2. Assessment of Plaintiff's Residual Functional Capacity ("RFC")

Plaintiff next argues that the ALJ failed to properly assess his RFC. Docket No. 10. Defendant responds that RFC determinations occur at step four of the sequential evaluation, and that, because the ALJ properly ended the evaluation at step two, there appropriately was no RFC

determination made. Docket No. 15.

Defendant is correct that a claimant's RFC is determined at step four of the sequential evaluation analysis. 20 C.F.R. 404.1520, 416.920. As has been determined above, the ALJ correctly concluded his analysis at step two. Accordingly, the ALJ was not required to continue to step four and determine Plaintiff's RFC. The lack of RFC determination was proper; Plaintiff's argument fails.

### 3. Failure to Obtain Testimony from the VE

Plaintiff takes issue with the fact that the ALJ closed the hearing with only Plaintiff's testimony. Docket No. 10. Plaintiff contends that the ALJ should have questioned the VE and given Plaintiff an opportunity to call other witnesses. *Id.*

Defendant responds that VE testimony was unnecessary because a claimant's vocational factors are considered after step three of the sequential evaluation analysis and the ALJ properly determined that Plaintiff was not disabled at step two. Docket No. 15.[7]

Defendant is again correct that the consideration of a claimant's vocational factors occurs after step three of the sequential evaluation analysis. 20 C.F.R. 404.1520, 416.920. As discussed above, the ALJ properly concluded that Plaintiff was not disabled at step two, thereby ending the analysis and obviating the need to solicit VE testimony. The ALJ's failure to question the VE was not erroneous; Plaintiff's contention on this point fails.

With regard to Plaintiff's assertion that the ALJ closed the hearing without giving

---

[7] Defendant does not respond to Plaintiff's contention that he should have been permitted to call other witnesses.

Case 3:11-cv-01019   Document 16   Filed 05/24/13   Page 29 of 34 PageID #: 769

Plaintiff an opportunity to call any other witnesses, it is important to note that the ALJ neither prevented Plaintiff from calling any other witnesses nor closed the hearing without giving Plaintiff an opportunity to call other witnesses. The hearing transcript states as follows:

> Parties Present:
>
> Gary Lee Bouldin, claimant
>
> K. Dickson Grissom, judge
>
> Jay Randall Hooper, claimant attorney
>
> Edward Smith, vocational expert

TR 33.

As can be seen, the parties present at the hearing were only Plaintiff, Plaintiff's counsel, the ALJ, and the VE. For the reasons discussed above, the VE was properly not called upon to testify. Significantly, Plaintiff was represented by counsel and no other witnesses were present at the hearing. There was nothing stopping Plaintiff or his attorney from bringing other witnesses to the hearing to testify, and there is no indication in the hearing transcript that Plaintiff's counsel even so much as indicated that he had witnesses who would like to testify on behalf of Plaintiff. *See* TR 33-54. Plaintiff was questioned by both the ALJ and his attorney, and, at the end of that questioning, Plaintiff's counsel indicated that he had no further questions for Plaintiff, but failed to indicate that he wanted to call any (non-present) witnesses to testify on behalf of his client. *Id.* Thus, the failure to give Plaintiff an opportunity to call other witnesses cannot be attributed to the ALJ, and the ALJ cannot be said to have erred in this regard. Plaintiff's contention fails.

## 4. Evaluation of Plaintiff's Credibility

Plaintiff's contends that the ALJ summarily concluded that Plaintiff's statements

concerning the intensity, persistence, and limiting effects of his alleged symptoms were not credible, and that in so doing, the ALJ failed to consider the requisite factors set forth in SSR 96-7p. Docket No. 10. Plaintiff argues, therefore, that the ALJ's "conclusory statement" precludes a full and fair review of his claim. *Id*.

Defendant responds that the ALJ properly discussed the relevant factors, including medical signs and laboratory findings, prognosis, medical opinions, and statements about Plaintiff's functioning. Docket No. 15. Defendant argues that, because the ALJ considered the relevant factors in conjunction with his discussion of the other issues before him, he did not need to again repeat that discussion again when determining Plaintiff's credibility, and that requiring such repetition would be nothing more than a "useless formality." *Id*.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's subjective allegations:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other.").

31

Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims and reach a credibility determination. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). After evaluating the requisite factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters,* 127 F.3d at 531; *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975).

After assessing all of the relevant medical, testimonial, and opinion evidence of record,

32

the ALJ determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his alleged symptoms were not fully credible. As can be seen in the ALJ's detailed discussion of the evidence recounted above, ALJ clearly articulated the evidence upon which he based his decision, including the inconsistencies which negatively affected his credibility finding. This determination is within the ALJ's province.

The ALJ observed Plaintiff during his hearing, assessed the medical, testimonial, and opinion evidence of record, reached a reasoned decision, and articulated the rationale for that decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

### IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

33

E. CLIFTON KNOWLES
United States Magistrate Judge

34